We will hear argument next in Case 23-146, Connelly v. United States. Mr. Shammigan. Thank you, Mr. Chief Justice, and may it please the Court, to ensure continuity in their operations, closely held corporations will often agree to redeem the stock of a shareholder upon his death, and then obtain a life insurance policy on the shareholder in order to fund the redemption obligation. This case presents the question of how the federal estate tax treats such arrangements. Because the proceeds from a life insurance policy to fulfill a contractual redemption obligation do not increase the corporation's net worth, they do not increase the estate tax owed on the decedent's stock. The Court of Appeals' contrary conclusion was erroneous. The legal framework governing this case is relatively straightforward. The Internal Revenue Code and Treasury regulations provide that where the parties agree on the price to redeem a shareholder's stock, that price will establish the value of the stock for purposes of the estate tax in certain circumstances. But whereas here those circumstances have not been met, the value of the stock is determined by the price at which such stock would change hands between a hypothetical willing buyer and willing seller. Here, a hypothetical buyer would not treat the life insurance proceeds as increasing the value of the stock because that asset is offset by the contractual obligation to redeem shares, a preexisting corporate liability. Now, the government argues that a court should attach no weight to the redemption obligation when assessing the value of the company. But the government fails to distinguish between a contractual obligation to redeem stock on the one hand and a voluntary stock redemption on the other. A hypothetical buyer would treat the contractual redemption obligation like any other debt that reduces the net worth and therefore the value of the company. The government's approach would lead to a grossly inflated valuation of the decedent shares and it would effectively lead to double taxation. It would defy common sense to take one side of the transaction into account, but to ignore the other for purposes of the estate tax. And it would destroy a valuable succession planning tool that the nation's small businesses have openly used for decades. The judgment of the Court of Appeals should be reversed. I welcome the Court's questions. Mr. Shanmugam, if a very interested buyer showed up the day after Michael died, would Thomas sell the business to him for $3.86 million? So if Thomas were the person we were thinking about and not Michael, I think it is quite possible that a hypothetical willing buyer would pay $3.68 million No, I'm more focused on the asking price. If a buyer showed up the day after Michael died and offered to buy it at any price, what would he sell it for? So I think it's important here to distinguish between Michael and Thomas. Which one died? Michael is the one who died. And Michael, of course, is the one whose shares would be subject to the $3 million But Thomas, he is actually in charge of the estate and the company. So he can actually sell the property, right? Yes, except for the fact that under the buy-sell agreement, Thomas is actually disabled from selling the property. Well, he has the first option. He has the first option. That is correct. But under the terms of the buy-sell agreement, the estate cannot sell the stock. Let me just blink that for a minute, okay? What would he ask for it, assuming he could sell it? Would he ask $3.86 million or $6.86 million, assuming that the insurance was included in the assets or liabilities of the company? Sure, Justice Thomas. So the first question is, what is the net worth of the company? Because we're in agreement with the government that that is the first question. Our view is that the net worth of the company throughout all of this is $3.86 million. The government's view is that the net worth of the company is $6.86 million. Because in the government's view, you take into account the life insurance proceeds but not the offsetting redemption obligation. So if a willing buyer shows up, and who owns the life insurance policy? So the company is entitled to the proceeds of the life insurance. And that is hugely important when you are applying this test. Because the fundamental problem with the government's view, our view is that 77% of $3.86 million is $3 million. The government's view is that 77% of $6.86 million is $5.3 million. A willing buyer would never at that moment, if buying Michael the decedent's shares, pay $5.3 million. Why? Because a willing buyer would not be able to capture those life insurance proceeds by swooping in before the redemption. Those life insurance proceeds belong to the company. Well, the value has to go someplace. The $3 million goes someplace. Does it go into the value of the remaining stocks? And if it is there, why isn't the appropriate valuation $6.86 million? The $3 million of the life insurance proceeds are used to redeem Michael's shares under the terms of the party's agreement. Now, as a practical matter, the problem here, and the fundamental issue that all of us are wrestling with, is that what we know is that you can't use the $3 million as simply the valuation. Why? Because, as I noted at the outset, we didn't satisfy the requirements of Section 2703. And therefore, you have to engage in this contrafactual inquiry. And the problem with the contrafactual inquiry that the government wants this court to engage in is, again, that it requires you to disregard the redemption obligation. Now, it is true that one consequence of our interpretation is that, as to Thomas, the surviving stockholder, Thomas, in some very real sense, benefits from the increase in value by virtue of this transaction. Why? Because Thomas goes from having 22% of the company to 100% of the company. But under our approach, as under the government's approach, that is taken care of by the eventual application of the capital gains tax. What the government wants you to do is to effectively take those life insurance proceeds into account twice. Once when calculating the estate tax, because the government wants you to tax this higher amount, $5.3 million. And again, no hypothetical willing buyer would ever have paid that. Crown would never have redeemed the shares for $5.3 million, and I'm happy to explain why. But then the government also will subject Thomas eventually to the capital gains tax on the increase in the value of his shares. And that, in our view, is the fundamental problem with the government's approach here. And that is why this is effectively double taxation. And to just spell out for another sentence or two why the $5.3 million valuation. It seems that the fundamental problem with your approach is that Thomas's asset has quadrupled in value. And it's quadrupled in value without him putting a single cent more into the company. And there might be some taxation effect in the end of all that. But not sufficient to make up for the fact that it's a tell that your way of calculating the thing is wrong. That somebody can come away with four times the value without putting a single cent into the company. So with respect, Justice Kagan, I completely disagree with that, and let me explain why. It is true that Thomas is, in a very real sense, practically the beneficiary of the life insurance proceeds. Why? Because those proceeds extinguish the offsetting liability on the books. The offsetting redemption obligation. And so this is a context in which Thomas does come away with the benefit of those proceeds because he is the sole owner of a company that is worth $3.86 million. Now the government complains around the edges about the fact that it's the capital gains tax. The capital gains tax only operates upon realization. There's a stepped up basis when someone dies and passes the stock along and so forth. But those are all features of the capital gains tax system. That is not a bug with our position. Again, our position is the rational one precisely because the tax system captures that increase. And of course, under our approach, Michael's heir is still, of course, paying the estate tax. Michael's heir is paying the estate tax on stock at around $3 million. Coincidentally, roughly the amount that was contained in the Bicel Agreement, which I think confirms that that amount was a rational amount here. But the problem with the $5.3 million, again, the government's view is, let's take Crown. The government's view is presumably that if there had been a proper arm's length agreement here, Crown would have been willing to pay $5.3 million to redeem the stock. That would have required Crown to use all of the life insurance proceeds here, the entire $3.5 million, and also to dip into its operating assets in order to redeem those shares. That illustrates why the government's position here is irrational. Now, to be sure, I think there is a conceptual... Why? If Thomas had done what he needed to do, both owners would have insured each other. They would have paid the price and gotten the shares. What you did was to off that to the corporation and give the corporation a benefit that entitled Thomas to own the company 100%. I think that's where Justice Thomas' question comes up. The value of the company is the value at which someone's going to own 100% shares of the stock. So, Justice Sotomayor, I think that that hypothetical, which the government uses, actually helps our position. And let me explain why. The government acknowledges that if you had a situation in which the individuals themselves took out the insurance policies and entered into a cross-purchase agreement, that it would be subject to tax treatment along the lines of what we are suggesting here. Why should this situation be treated differently? And one reason, parenthetically, why that alternative is impractical is that if you have a company with multiple owners, that gets very complicated. But it's also distinguishable because in that situation, the individuals have to pay the premiums. Here, the reason why the corporation is paying the premiums is precisely because the corporation derives a benefit from this arrangement. And that benefit, as I said in my very first words, is continuity of ownership. That is an incredibly valuable benefit to closely held corporations in this context. And so this is not a situation in which the corporation itself derives any sort of windfall. The corporation is paying premiums, and it gets the life insurance proceeds in return. I think what the government is really bridling against... Thank you. Mr. Shanmugam, what is the right perspective? So when Justice Thomas asked you the question, you know, he said, how much would you buy the company for, I think. But regardless of how he asked it, I think that would be one way to consider it. Like, what was the whole value worth? Or do we ask, if you had a stranger to the situation, what would the price of one share be? Is that the right way to think about it? And then just kind of to build on to that, do you assume the perspective of Thomas? You know, someone who would buy one of Thomas' shares, or someone who would buy one of Michael's shares, or just someone who, like, you could even pretend that you had a third brother named Ralph who only had one share. Like, what's the right way to think about it? So, Justice Barrett, it is a hypothetical buyer of the same proportion of shares in the company. So it's a hypothetical buyer of 77.18% of Crown's shares. Now, I think the reason why we talk about the value of a company here is that I think we are in agreement that under the relevant regulations, and this is 20, 2031, 2F, we are really focusing on the net worth of the company and then multiplying the relevant percentage here. I think we and the government are in agreement that that is the correct approach here. Now, that will not always be true. There may be circumstances in which, for instance, that block of shares gives you a control premium that needs to be valued. And when you look at the lower court case law in this area, often the price will then be adjusted up or down. But we're all in agreement that there's no such adjustment here. And so really, the fundamental question here is, what was the net worth of the company? And to make just two additional points about that. The first is the reason why we're talking about a hypothetical block of 77.18% of the shares is precisely because if we were talking about Michael's actual shares, those shares are about to be extinguished. They're subject to the redemption obligation. So I think there's really no good conceptual way to do that. And I think that the regulations recognize that when they talk about the fact in 20, 2031, 1B, that you can look to an equivalent asset, a comparable item, in the words of the regulation, when you're making this determination. And then I think the second thing that I think is important to keep in mind here is that when you're talking about the net worth of the company, I don't really hear the government to dispute the fact that an obligation to redeem shares would be treated ordinarily, and common sense bears this out, as a liability like any other. It's a legally binding obligation. The accounting standards treat it as a liability. In fact, the accounting standards go so far as to specifically enumerate stock to be redeemed upon the death of the holder as giving rise to a liability. So fair enough on that, but just see if I've got this right and tell me where I'm wrong. You agree that the relevant value is of the corporation as a whole. And really the question is what do we do with the $3 million in life insurance proceeds? How should that be dealt with? And I hear the government saying a prospective buyer would consider that part of the assets of the corporation, and therefore it enhances the value of the company to 5 point whatever it is. And I hear you saying, no, you really shouldn't count those insurance proceeds because they're earmarked for the redemption, and so no willing purchaser would account for them in part of his assessment of the value of the company. Is that a fair assessment of the difference between the two? I would word the point slightly differently, Justice Gorsuch, but I think this difference is important. We're not disputing that the life insurance proceeds are an asset. What we're really debating here is whether or not they are a net asset. Whether a willing buyer would consider them part of the value of the company that he's going to obtain when they're really earmarked for redemption. And what a willing buyer would do, I think, is to look at this and to say, yes, there are $3 million in life insurance proceeds that are going to come into the company, but those proceeds are going to immediately go out again. They're going to go out in order to fund this offsetting liability, which is on the books. And under our approach, which, again, I think accords with a healthy dose of common sense here, when the parties entered into the initial buy-sell agreement, that had the effect of putting an asset and a liability on the books at the same time. But offset one another. They offset each other at every point. And that is precisely why, as I said in response to one of the earlier questions, under our approach, the net worth of the company is the same throughout. In other words, it's the same before death, it's the same at the moment of death, and it's the same after the redemption obligation. You know, one wrinkle to that, though, is I don't think the life insurance proceeds, the only permitted use for them was the redemption, and the government makes something of that. That is correct, and that's why I didn't pick up on the word earmarked in your question, because money is fungible. And so I think our analysis would be the same if you were talking about $3 million that happened to be some other non-operating asset. It's still a $3 million liability. It would still be offset. And, indeed, in this case, life insurance policy was not for $3 million. It turns out it was for $3.5 million. We're all in agreement that the remaining $500,000 is an asset, a non-operating asset that should be on the company's books. And so all we are doing here, I think, is giving effect to the broader framework, which not just Congress but the Treasury and the IRS has set up here, which is a framework that says that when you are in the hypothetical world conducting this analysis, you assume that the hypothetical buyer and seller takes all relevant facts into account. Keep going. I'm sorry. And I think that the problem with the government's approach is that the government's approach requires you to do one of two things, either to disregard the offsetting liability or to assume, and I think when you look at the government's italicized hypotheticals, all of them effectively do this, to assume that your hypothetical buyer is somehow going to be able to capture the life insurance proceeds. That was the flaw with the Court of Appeals reasoning, because the Court of Appeals posited a situation where you had a buyer not just of the 77 percent of the shares but of the entirety of the company. Of course, if a buyer could get their hands on both Michael's shares and Thomas's shares, presumably the first thing that buyer would do is to extinguish any redemption obligation, not that that redemption obligation would make any sense in that hypothetical, and to have the benefit of the $3.86 million in corporate value and the $3 million in life insurance proceeds. Something you said that I think is critical to your position is that the net worth before, on the day of, on the day after, a month after, after the life insurance and the redemption has occurred or whenever after that is constant. Yes, and that is different from a voluntary redemption. Much ink is spilled, both in the government's brief and in the briefs of the amicus law professors, on the fact that when you're dealing with a voluntary redemption, let's say a publicly held company decides on the next day to redeem shares, at that point it is true that you are going to have a diminution in the net worth, which ensures that the remaining shareholder stock remains relatively constant. That actually turns out not to be true when you're dealing with publicly held companies, because often the stock will move up or down in response to such an announcement, but I think that basic principle is one that we don't disagree with. But everything in the government's brief presupposes that a voluntary redemption and a contractual obligation to redeem shares are treated exactly the same way. And I think the problem is that if you're a hypothetical buyer looking at the company, a redemption obligation is like any other debt. You see that on the corporate books, and that is $3 million that is going out the door. Now, to be sure, this is a hypothetical buyer, and so we are presupposing that the buyer is not attempting to buy the shares that are subject to the redemption obligation. That would, again, be impossible under the terms of the buy-sell agreement, and even if they could, they would be entitled only to $3 million, and we're disregarding that figure. On the professors, Professor Chodorow and Professor Hellwood's amicus briefs, obviously they've spent a lot of time thinking about this issue. They're against you. Maybe you just covered it in your view, but where do they get it wrong? Maybe your point is the voluntary redemption is where they get it wrong, but I'd like some more explanation because they clearly have studied this. I think that that is the fundamental flaw, is that they really presuppose a voluntary redemption, and so many of the principles that they set out, and indeed the four principles that the government sets out, are principles that we have no objection to in that context. In this context, by contrast, again, it's that a hypothetical buyer would not somehow disregard this redemption obligation. The hypothetical buyer would take it into account and recognize that the funds that are coming in are going out the door again, and to be clear, this results in no windfall whatsoever to anyone other than the benefit to Thomas that's going to be taxed. I think when the government says that the purposes here are not legitimate, there's nothing in the case that we disagree with more. The reason that closely held corporations engage in these transactions, as the Chambers amicus brief explains at some length, is precisely because this is a way of ensuring continuity of operations without engaging in disruption. If you don't have the life insurance proceeds here, most of these companies, which are typically very small, are going to have to dip into operating assets or otherwise engage in some sort of transaction to ensure continuity. If you have an heir who doesn't want to run the company, or if the heir is someone outside the family, you have a very real risk that that person will not be interested in running the company or that you'll have a disruption of operations. Mr. Shamagin, can I just ask you, because I'm trying to follow. So you've said many times that the money is going out, but I guess I'm trying to figure out whether the proceeds of the life insurance are really going out when they're being used to redeem the shares. So what is the effect on the value of the remaining shares once the redemption occurs? So the remaining shares effectively have a larger share of ownership in the company. And their value increases. Is that where the four times that Justice Kagan was talking about, is that where that comes from? Yes, that's correct. And this is the contrast, I think, with a voluntary redemption. Because in the context of a voluntary redemption, rather than these life insurance proceeds, something else has to go out of the company and you are getting the shares back into the company. And the reason why that is different is that here you are extinguishing an existing liability. That is what makes this different, is that you have a liability on the books. You're treating this redemption obligation like any other redemption obligation. And it's really not like any other redemption obligation, because this obligation is benefiting the equity interest that we're trying to value. And so it just doesn't seem to make a lot of sense in that context to say that the redemption obligation simultaneously serves to reduce the value of that interest. I think that that's a fair factual statement, but let me explain to you why that should make no difference. In our view, the redemption obligation is, like any other debt, from the perspective of the hypothetical buyer. And I recognize that this is the artificiality of the case, but I think it's an artificiality of the case that is inherent in the way that the regulations work, and I think it's a problem that the government has to come to terms with as well. Our view is that from the perspective of a hypothetical third party, the fact that this redemption obligation runs to somebody else is of no moment. The hypothetical buyer here is not in the same position as Michael. It's a hypothetical buyer. And so that is why we think that when you're applying a regulation that requires you to take into account all relevant facts, you've got to look at the economic reality from the position of the company. And again, the best way, I think, to understand that is to think about whether or not the government's fair market valuation would be one that the parties would use. We know that our fair market valuation, in fact, pretty closely tracks the price that was agreed. $5.3 million would have destroyed Crown if Crown had spent that amount of money to redeem the shares because, again, the life insurance proceeds would not have covered that amount. And I think that illustrates why the government's position cannot be correct. Thank you, counsel. Justice Thomas, Justice Alito, Justice Gorsuch, Capito, Justice Barrett. Can I just ask one more question? Assume that the company doesn't take out life insurance to fund the redemption. The agreement just says the company promises to redeem the shares at fair market value upon the shareholder's debt. What, if anything, about your treatment of the redemption obligation changes in that circumstance? So I think the analysis is somewhat different, Justice Jackson, and I think that that is similar to the two sisters hypothetical that the government uses in its brief. And that is for the simple reason, and we've kind of been talking to some extent about this, that in that hypothetical the obligation to redeem shares actually has a depressive effect on the company's future earning capacity. Why? Precisely because the company has to use other assets and typically operating assets in order to fund the redemption obligation. And in that circumstance there could well be a depressive effect on the valuation, and that depressive effect could in fact be substantial. One reason why this circumstance is different is precisely because where you have an offsetting life insurance policy and redemption obligation, it actually makes sense to think about valuation in terms of the net worth of the company. I think once you start to get away from that, the valuation of the company is affected by its remaining operating assets, how the business is going to do on a going forward basis. But here, precisely because there's no effect on the remainder of the company, it makes sense to engage in the valuation by multiplying the percentage of shares by the net worth. Thank you. Thank you, Counsel. Ms. Dubin? Mr. Chief Justice, and may it please the Court, the estate's valuation of Michael Connolly's shares contradicts basic math and valuation principles. According to the estate, before we can value Michael's shares in Crown, we must first subtract the price that Crown paid for Michael's shares. In other words, the estate's theory is that before you can value something, you must first subtract the price paid for the very thing you are trying to value. That makes no sense. Using the item you are trying to value as a line item in its own valuation will never give you the correct answer, and it doesn't give the estate the right answer here either. The estate's contrary view rests on a fundamental misunderstanding of the nature of a redemption obligation. A redemption obligation is not a corporate debt that reduces the corporation's net worth or the value of the shares to be redeemed. A debt owed to creditors reduces corporate and shareholder value. A redemption obligation divides the corporate pie among existing shareholders without changing the value of their interests. And here, the corporate pie was worth $6.86 million, not $3.86 million. And that's true even if you look only at the estate's own numbers. Petitioner admits that Michael's estate walked away from the redemption with approximately $3 million in cash. But Petitioner also admits that Thomas walked away from the redemption with $3.86 million in value. And the estate doesn't dispute the black-letter valuation principle that the interest of each equity shareholder added together has to equal the company's total value. That defeats their position because that means that Crown's total net worth before the family divided the company was $6.86 million, the value of the two equity slices put back together. And that means that the estate's valuation of Michael's 77 percent stake in Crown at $3 million came nowhere close to fair market value. I welcome the Court's questions. I think what Petitioner is arguing is that, yes, we took the insurance policy, the receipts, at $3.5 million. We paid out three, and we received the shares, so it's a wash. The $3 million, up to $3 million is a wash. So what do you do with that argument? Sure. So that argument depends on the idea that the $3 million redemption obligation is a debt, a liability. And that's just not correct. What it is is a promise to cash out one of the existing shareholder shares. So, for example, in the Two Sisters hypothetical on page 27 of our brief, if you own 80 percent of a company worth $5 million, you have a $4 million stake in the company. A redemption obligation at fair market value would be a promise to cash you out for your shares for your stake in the company. It is not the same thing as the corporation, for example, owing a mortgage or some other debt. A mortgage or some other debt like that would reduce the value of the company and the value for its shareholders. That is simply just not true of a redemption obligation. And I think that, you know, it's sort of important that Petitioner concedes that a voluntary redemption obligation wouldn't decrease the value of the company, because on the date of Michael's death, it doesn't matter whether the redemption obligation is voluntary or mandatory. $3 million is being paid to Michael's shares, so that's where that money is going. But it is going either whether that's voluntary or mandatory. The point is that that was part of the corporate assets here, and it was paid to Michael on the date of his death. Do you agree that none of the money escapes taxation? Because more value – I mean, the $3 million of the life insurance proceeds didn't vanish. As you say, it's retained by the company. And Mr. Shanmugam was pointing out that Thomas will be taxed on that as a capital gains tax when he sells out his shares. So Mr. Shanmugam says that means that the government is double-dipping. What do you have to say to that? A couple of responses to that. First of all, any sort of double-dipping allegation comes from the Connolly family's decisions to value the shares at the low fair market value. Had these shares been redeemed for fair market value, which is $5.3 million, there would be no risk of double taxation. The risk of double taxation comes because $2.3 million stayed in Crown and inured to Thomas' benefit, but that money was really part of the fair market value of Michael's shares. In a normal – in a transaction that was done at fair market value, you would have had $5.3 million go to Michael's estate, be subject to the estate tax, and never be subject to any possibility of future taxation through capital gains on Thomas. So that's the first answer, which is this problem comes because the estate valued these shares below fair market value. But the second answer is that we just simply can't know what will happen to Thomas' shares in the future. Maybe they will be subject to capital gains. It depends if he bequeaths them. It depends what they're worth at that time. That's a separate inquiry that goes to the value of Thomas. The estate tax cares about the value of Michael's shares at the time of Michael's death in Michael's estate, not what went to any of the particular heirs or beneficiaries. Am I wrong that on capital gains you pay the tax – capital gain at the price that you've gotten it? If you get a stepped-up basis. And that's why he won't pay on that? If he sells it during his lifetime, he didn't get these shares as a bequeathment, so he's not entitled to a stepped-up basis, but he could pass it on to his heirs with a stepped-up basis. The net worth question that Mr. Shamgim said the net worth stayed the same all the way through. A, do you agree? B, why is that not relevant if it is true? It's not true. The corporation was worth $6.86 million on the date of Michael's death. Our view is not that only somehow Michael's shares had some value in them that the corporation didn't have. Our view is that the corporation's equity value is made up by the equity stakeholder's value. Michael's shares were entitled to a $5.3 million valuation, and Thomas's shares were a $1.5 million valuation. That adds up to our $6.86 million valuation. Why is it – you said the redemption obligation is not a debt. Just walk me through that if you can, because I find this case extremely difficult. So, it seems like a key point, and I'd like to hear you explain it again. Sure, and I would just start off with saying, I mean, I think the petitioner agrees that a voluntary redemption is not the paying of a debt. So, I think that's sort of – to the extent – But he's saying that's the key point in the case. I think that's what he said, so I'd like to hear you address that. Yeah, and I think that – I think we've been talking a little bit about them because they are very helpful in explaining just the nature of a redemption generally. But the nature of a redemption, what a company is agreeing to do in a redemption is to exchange one of the existing shareholder's shares, so their stake in the company, their equity stake in the company, in exchange for cash. So, that's the promise. It's, we will get back your equity shares, and we will give you cash in exchange for it. If that were done at fair market value, it would mean that if you had an 80% stake in a $5 million company, you would be entitled to $4 million in cash. What happens on the other side? Your shares are extinguished, so they no longer exist. So, the remaining shareholder, who was a 20% stakeholder in our $5 million company, he had a – originally, to start, he had a 20% stake in a $5 million company, which is a $1 million stake. Now, after this redemption, which is paid out at $4 million, he would be left with sole ownership of a $1 million company. So, in a redemption, both of the corporate shareholders, if the redemption is done at fair market value, they both walk away with the same value they had before. By contrast, in a debt situation, where you're paying a debt, the corporation pays money out of its coffers to someone outside the corporation, and that will reduce both the corporate and the shareholder value. And if this had been that sort of $3 million debt, then petitioner's analysis would be right. But here, the $3 million went into Michael's pocket. It went to one of the equity shareholders. So, that does not decrease the value of the corporation or, of course, the value of the shares to be redeemed. And I think, just to pause on that for a second, you know, petitioner says, what we're really valuing here is some theoretical stake in the corporation, not Michael's shares. That's not correct as a matter of the statute. The statute tells us, in 26 U.S.C., 2031, 2033, and 2036, that the relevant shares to be valued here are the decedent shares. That's, of course, what we're valuing. So, that's not correct. But even if you were going to value some hypothetical 77% stake in the company, some 77% stake in the company with a redemption obligation or anything like that, you would always get $5.3 million, because $5.3 million is what that stake is equivalent to. The only way you get petitioner's numbers is if you treat it as if there's a separate $3 million debt that you first take out of the company, and then you try to value Michael's shares. But that just doesn't make sense, because that $3 million runs to the holder of Michael's shares. It is not some free-floating debt out there in the universe. But it would work if — petitioners would work if it was a free-floating debt somewhere outside in the universe. Yes. If it were debt owed to creditors, just generally, when you're doing a very simplistic valuation of a corporation, you would subtract the liabilities owed to creditors before you determine what is the equity value remaining. But here, we're looking at an equity stake, and money paid to an equity stake, and you can't say that that reduces the value of that equity stake or the value of the corporation as a whole. Would your answer differ if the life insurance proceeds had been earmarked for the redemption of Michael's shares? No. The party's intent doesn't govern here. I think both we and petitioner agree that the $3 million is actually an asset to the corporation. It does count, and we both agree on that. The only question is whether it's offset by a debt, offset by a liability. And for that purpose, I think, it doesn't matter. Help me on that, because I understand a hypothetical purchaser of the company as a whole would say, ah, that $3 million is going to inure to my benefit because I'm just going to extinguish the redemption obligation, and off we go. But if somebody's purchasing Michael's shares at the time of his death, why isn't it different then? Because we're assessing his estate value, and there you have an obligation to pay him out, and the insurance proceeds coming in to do that. Absolutely. And the answer is that for all of the illustrations that we've suggested, whether it's a buyer of Crown as a whole, whether it's a buyer of just Michael's shares, you will always be able to capture the value of the insurance proceeds. Okay, but you agree the relevant measure is the buyer of Michael's shares? Yes, although as Petitioner mentioned, we agree that it's a pro rata share of Crown as a whole, so you will get the same number whether you value a buyer of Crown as a whole and then take Michael's pro rata share of that or value just Michael's shares. Either way, a buyer who just buys Michael's shares is going to get a 77% stake in a company with total assets of $6.86 million. So if that redemption obligation now runs to him, he will get cash in exchange for the 77% obligation. If the redemption obligation is for some reason not honored or whatever it is, then he has a 77% stake in a company worth $6.86 million. But what the problem with Petitioner's case is that he tries to take $3 million out of that pot, but the problem is that that $3 million goes to the holder of Michael's shares. Feel free to tell me this is the wrong question, but what's the net worth of the company after the shares are redeemed? On Petitioner's view, it's $3.86 million, and you see this in the pie charts that they have on the Reply.Beeb on page 6. How about on your view? On our view, had the redemption been done at fair market value, which it was not, had the redemption been done at fair market value, it would be $1.53 million. But I think that picks up on a critical point, which is our view, the government's view here about how the estate tax works, doesn't change how the parties had to structure their transactions. They are free to redeem shares at the low fair market value for whatever business or idiosyncratic reasons they want to, but the estate tax looks at what was the fair market value of those shares. So after they get the life insurance proceeds and redeem the shares, the net worth of the company has dropped dramatically in your estimation. Yes, and that's the fundamental way. Doesn't that seem, just explain that to me. Sure, and I think this goes a little bit to your questions earlier about how a redemption is supposed to work. A redemption is essentially, it's sort of like a spinoff, right? You're dividing the corporate assets among existing shareholders. One is getting cash in exchange for their share, and one gets sole ownership of a company worth less. It is a problem for Petitioner that notwithstanding that that's how a redemption is supposed to work, in his view the corporation maintains the same amount before and after. And the reason that the problem comes from is because he's saying the corporation is worth $3.86 million before, but it's actually worth $6.8 million. I think it's odd that you have a net worth of the company. What's the net worth of the company in your view the day before he dies? So, I don't mean to pause, but the trickiness of it is trying to value the life insurance policies the day before he dies. There's a cash surrender value of the life insurance policies, which is approximately $500,000 the day before Michael dies, so that's a little bit tricky. But putting aside any interest in the life insurance policies whatsoever, it's around $3 million. Okay, and then after he dies, even though they've bought the life insurance for exactly this purpose, the net worth of the company's dipped in half, right? So, a trick... That seems a little, I mean, maybe you say they just messed up, but the whole purpose of the life insurance policy was to make sure that didn't happen, right? So, two responses to that. On the first point, if you're only looking at Crown, it is correct that after the redemption, Crown becomes a smaller company. That's how redemptions work. But if you're looking at the total value that the Connolly family walked away with, they're going to walk away with a total of $6.86 million. Some of it was used to buy out Crown, buy out Michael, and some of it was used to Crown. To your point about what the parties want... Thomas got out of this well, I think, but I'm not sure why the company's net worth should dip in half when the whole purpose of getting the life insurance policy, I think, you've probably already answered this, but the life insurance policy was meant to prevent that, I thought. I think that my understanding is that is what the parties intended. Intent doesn't govern here. I got it. But it's weird to walk away the day after his death with a company that's suddenly worth 50% of what it had been worth the day before his death, even though you bought a life insurance policy to cover the redemption. Yes, so two responses to that. One is it's really not strange in the concept of what a redemption is. That is what a redemption is supposed to do. A redemption is supposed to give one shareholder cash in exchange for their assets, and the other one is supposed to maintain control of a smaller company. But to your point about it doesn't seem like that's what the parties wanted to do here, you're right. What the parties wanted to do here was maintain Crown as a $3.86 million enterprise and give Michael $3 million. That's what the parties wanted. That means that there's $6.86 million of value in the estate tax because Michael owns that $6.86 million of value. His percentage stake of it says that was the fair market value of Michael's shares. I think that sort of pulls up Petitioner's points about continuity of ownership. There are many ways in which to arrange for continuity of ownership of a closely held corporation, but what you can't do is have $6.86 million of corporate assets by virtue of a life insurance proceed, take $3 million out and give it to one shareholder, maintain the company in its $3.86 million size, and then maintain for purposes of the estate tax that the company wasn't worth $6.86 million. Do you dispute your friend's statements that this has been a common way for family corporations to maintain continuity of operations? And if that's the case, how long has the government overlooked the fact that there was this great pool of money out there waiting for them to take? Sure. So our understanding is not Petitioner's understanding. This is what we know, and I'll tell you what we know, which is there have only been these three reported cases that we know of. So it's Blount and Cartwright from 1999 to 2005, and then this case. That's it. So in terms of the litigated cases, not very many. We did ask at the search stage the IRS examiners who are charged with looking at the estate tax returns if they're seeing a lot of these in the pipeline, and they are not. They couldn't find any. So they didn't see any sort of maneuvers like this in the fact patterns in what they are looking at. I understand that that's not sort of a conclusive view over whether people are doing it or not. My guess is that, or my view is what should have been happening, is that tax advisors are looking at what you have on the one hand is the Ninth and Eleventh Circuit extremely thinly reasoned decisions on this, and on the other hand what you have is the tax court's decision in Blount 1. And the tax court's decision in Blount 1 explains extremely clearly that this doesn't make sense because you are, you know, subtracting the value of the very thing you're trying to price in determining the value of that thing. And so what are most... I'm sorry. I was just going to say, so the Ninth and the Eleventh Circuits were on your friend's side. That's right. Which might suggest that it is a common way for family corporations to maintain continuity of operations. Right. So I would say my best guess is that if this is happening often, it was probably happening in the Ninth and Eleventh Circuits, which of course this case doesn't arise from. This comes from the Eighth Circuit. And that might be one way that advisors are saying they can do it in those circuits. Tax advisors tend to be risk-averse. I think they would be very well aware of the fact that there are other ways to structure this, like the cross-insurance agreement, or held by a trust, or various ways in which the critical piece is that the life insurance proceeds do not go into the corporation. Because the premise of Blount and Cartwright, the Court of Appeals decisions, is that somehow you can have money come into a corporation and have it not count when you're valuing shares in the corporation. And there's no reasoning whatsoever to explain why they think it's appropriate to treat the redemption obligation as a liability. Well, they might think it's appropriate because the money that comes in goes out fairly quickly. I agree. That's definitely the sort of initial appeal of what Petitioner is saying and what the courts must have thought was true in Blount and Cartwright. It's simply just not correct, though, because the going out matters. If it's going out to a creditor, it reduces the corporation's net worth and it would reduce the shareholder's values. We absolutely agree with that. But here, when it went out, it went out to the holder of Michael's equity stake. Michael has a stake, and we are cashing out his shares. That's what's happening there. So it's not something that reduces the value of the shareholder's shares. It would not reduce the value of Michael's shares, and it wouldn't reduce Crown's net worth when we're looking at it. It's not a debt owed to creditors. It is a promise to exchange a shareholder's shares for cash. So if the IRS doesn't see many people doing this, what are they saying? What do families do instead? Our understanding is it's much more common to do the cross-purchase arrangement. So you keep, right, the two brothers would cross-insure each other. The life insurance proceeds would never come into the corporation. And so you have a situation where, if Thomas wanted to, he could buy Michael out, and that would be a much simpler way of accomplishing that, and you wouldn't have this problem that we're dealing with here where you have corporate assets that Petitioner has to argue shouldn't be counted as corporate assets. And the reason that's not as attractive is because, in this situation, it's the corporation that is paying the premiums? They're different. They're not economically exactly the same transactions, of course. It's not us saying that this is, you know, sort of just a form over substance distinction. That's not what's happening here. They're different. In the situation that happened here, you had Crown paying the premiums. Crown had the benefits and burdens of ownership, and that's why, in the end, when Crown then gets the proceeds, it's treated as a corporate asset. In the cross-insurance arrangement, it would be the brothers personally responsible for maintaining those life insurance policies. And, no, there would not be the same confidence from one brother to another that you will maintain those policies. So these different tactics do have different economic consequences, but those are the choices taxpayers can make as they're navigating how can we minimize the estate tax consequences of a large estate. Your position doesn't depend on this, but I think it's a little rough to tell a tax advisor, oh, figure out whether the 9th and 11th Circuit opinions are thinly reasoned and don't follow them when they're... So I don't mean to disparage those decisions in any way, but I think that if Your Honor would look at them, I don't think you would need to be a tax specialist to think that they are not a full-sum analysis of this issue. There's a few sentences, and they don't engage at all with the arguments that the IRS had been making. Right. That's fair. But, normally, you'd rely on the bottom line, I think, if you were in that business of two courts of appeals. But you have a whole bunch of academics who, for years, have been writing about this. There are many academics who have been writing about it, including one of them, you can see here, Professor Chaudhary. There's also many, many other articles that have come out since those cases explaining why they're wrong, including those by Delaney, Burke, and Bogdanski, and other professors. But I think just to go to sort of the heart of your question, the tax court, you know, is free. It doesn't have to follow the 9th and 11th Circuit decisions. So if you are coming up in a circuit that is not the 9th or 11th, there is no reason for you to think that those 9th and 11th Circuit precedents are governing, and I do expect that tax advisors would know that. But if I could just sort of put this in most, you know, it's a little bit hard for me to get this through my head, but your basic pitch is this is not any old liability. This is a redemption obligation. A redemption obligation is supposed to split the pie. So you come away with a smaller pie. That's because that's what redemption obligations do. Yes, that's correct. That's our basic pitch about a redemption obligation. I would just add that the other part of our pitch is that the hole in their case is that they are trying to value Michael's shares after Crown already redeemed them. You can't do that. The price paid out for Michael's shares is value that goes to Michael's shares. If you subtract that as a $3 million liability before trying to value Michael's shares, you will never get the correct answer. Thank you, counsel. Anyone, anything further? Anything further? No. Thank you. Rebuttal, Mr. Shanmugam. So the gist of the government's position is that it's not any old obligation. But that's the fundamental problem with the government's position. You see, the government doesn't dispute the fact that it is a liability in common sense or accounting terms. They say, well, it's a liability that runs to an equity holder. It's a liability that runs to Michael. But the problem here is that we're analyzing this from the perspective of a hypothetical buyer, not Michael. And from the perspective of a hypothetical buyer, this is therefore like any other debt. The fact that the debt runs to one of the other shareholders rather than to the bank that holds the mortgage is of no moment. It is a liability that does not inure to the benefit of the hypothetical buyer. And so when valuing the company and determining its net worth, you have to look at it from the perspective of somebody who is examining the entirety of the company and trying to figure out what he or she would pay for that share. And while it is true that we're trying to value Michael's shares, we're not trying to value Michael's actual shares because, after all, those are the precise shares that are subject to the $3 million redemption obligation and are going to be extinguished. That's why you have to make the move to a hypothetical block of shares in the same proportion. Now, let's drill down a little bit about the basic flaw in the government's position. I think this flaw was illustrated in the colloquy between my friend Ms. Dubin and Justice Kavanaugh. And that is because the government's position is not just that Michael's shares are worth $5.13 million. It's that after the redemption, the remaining shares, Thomas's shares, would be worth $1.53 million. What does that tell you? It tells you that in order to engage in a redemption at fair market value, the company would have to do something that it would never do. This is a $3.86 million company that would have to use some of that corporate value and some of its operating assets in order to redeem the shares and thereby diminish the remainder of the company and be left with a sub of a company. And particularly for a company like Crown and an industry like the construction industry where most of the assets are literally bricks and mortar inventory, that is something that is completely counterfactual and would never take place in the real world. And parenthetically, to the extent that the government comes back to the fact that supposedly under our approach, the two sets of shares would add up to $6.86 million because Thomas's shares would be valued at $3.86 million, the problem with that is that $3.86 million is the post-redemption value of Thomas's shares under our approach as the pie charts in our reply brief bear out. If you were valuing Thomas's shares, those shares would be worth only $880,000 at the time of Michael's death, precisely because what you're trying to do is to value the entire company from the perspective of a hypothetical buyer. Now, to the extent that the government says, well, you're getting a benefit here. You're getting a $3 million redemption of shares and Thomas is walking away with the same company that existed beforehand. That is a feature of the fact that the company is getting the rewards of the life insurance. It is getting $3 million and that $3 million is being put to use. But that is being accounted for by the operation of the tax system and in particular the operation of the capital gains tax. And to the extent that Ms. Dubin today in response to Justice Sotomayor said, well, you may not get that money right away. You only get it upon realization. You only get the difference between the value at the time of realization and the value at the time that Thomas acquired the shares. All of those are features of the capital gains system. In terms of whether or not this is a common practice, that's obviously a hard thing to quantify. I would respectfully submit that the number of client alerts and the amount of froth in the industry in response to the court's grant of cert suggests that this is a pretty common practice. But if we look at the reported cases, I think the two critical facts are, first, that the government, in fact, took the contrary position in a state of Cartwright, a case where the contrary position benefited the government because we were dealing with income tax rather than the estate tax. Second, that the government never indicated its non-acquiescence in those decisions as the IRS sometimes does when it disagrees with them. And third, that I think it's a little bit unfair to disparage the Ninth and the Eleventh Circuits here because it isn't as if the Eighth Circuit offered more extended reasoning. The sum total of the Eighth Circuit's reasoning was that if you posited a buyer of the entirety of the company, that buyer could capture the value of the life insurance proceeds. And ultimately, that analysis is fundamentally flawed. And none of the alternative ways of attempting to achieve the same result that the government posits, in fact, are successful. I think Ms. Dubin actually herself illustrated the flaws with individuals cross-purchasing insurance in order to conduct this arrangement off the corporate books. Individuals could, of course, change their minds. There would be the lack of certainty. But fundamentally, the corporation would not be paying the premiums, and the corporation is the one who benefits from continuity of ownership. Thank you. Thank you, Counsel. Counsel. The case is submitted.